UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

Gabriel Ramos,[1]

       Petitioner,

   v.                                                         20-CV-371
                                                              DECISION & ORDER
WILLIAM P. BARR, *Attorney General*;

THOMAS FEELEY, *Field Director for
Detention and Removal, Buffalo Field
Office, Bureau of Immigration and
Customs Enforcement*; and

JEFFREY SEARLS, *Facility Director,
Buffalo Federal Detention Facility*,

      Respondents.

─────────────────────────────────

     Gabriel Ramos has been detained in United States Department of Homeland

Security custody since June 18, 2019—nearly 13 months.  Docket Item 6-1 at 3.  On

March 27, 2020, Ramos filed a *pro se* petition for a writ of habeas corpus under 28

U.S.C. § 2241, challenging the validity of his detention at the Buffalo Federal Detention

Facility ("BFDF") in Batavia, New York.  Docket Item 1.  On May 21, 2020, the

respondents answered the petition, Docket Items 6 and 7; and on July 9, 2020, Ramos

replied, Docket Item 11.[2]

     For the reasons that follow, this Court grants Ramos's petition in part.

───────────────

     [1] Ramos inverted his name in the caption of his petition.  *See* Docket Item 1 at 1.
The Clerk of Court shall update the caption as indicated above.

     [2] Although Ramos's reply was filed late, the Court accepts the submission in light
of his representation that the delay was caused by complications resulting from the
ongoing COVID-19 pandemic.  *See* Docket Item 11 at 7.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts, taken from the record, come largely from filings with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE").

Ramos is a native and citizen of the Dominican Republic.  *See* Docket Item 1 at 1; Docket Item 6-1 at 2.  He entered the United States at an unknown time and place without permission or inspection.  Docket Item 1 at 1; Docket Item 6-1 at 2.  Ramos's status was adjusted to Lawful Permanent Resident on March 27, 1995.  Docket Item 1 at 1; Docket Item 6-1 at 2.

On December 4, 1997, Ramos was convicted in Superior Court, Providence County, Rhode Island, of trafficking drugs and receiving stolen goods.  Docket Item 6-2 at 1.

On August 21, 2012, ICE served Ramos with a "Notice to Appear," charging that he was subject to removal from the United States under various provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537.  Docket Item 6-2 at 5-7. More specifically, DHS charged that Ramos was subject to removal under section 1227(a)(2)(B)(i) for having been convicted of a controlled-substances offense and sections 1227(a)(2)(A)(iii) and 1101(a)(43)(B) for having been convicted of an aggravated felony, namely illicit trafficking in a controlled substance.  Docket Item 6-2 at 6.  Ramos was released on a $10,000 bond.  *Id.* at 8.

On October 24, 2018, Ramos was convicted in Supreme Court, New York County, of criminal possession of a controlled substance in the third degree.  *Id.* at 9.[3]

On May 9, 2019, DHS amended the Notice to Appear, charging that Ramos was subject to removal under an additional provision of the INA—that is, section 1227(a)(2)(A)(ii)—for having been convicted of at least two crimes of moral turpitude at any time after his admission.  *Id.* at 19-20.

On June 19, 2019, ICE took Ramos into custody.  Docket Item 6-1 at 3.  DHS determined two days later that Ramos would remain in detention pending removal. Docket Item 6-2 at 24.

On November 18, 2019, an Immigration Judge ("IJ") denied Ramos's applications for relief from removal and ordered him removed to the Dominican Republic.  *Id.* at 25-34.  Ramos had begun those applications in September 2012, but the proceedings were "continued fifteen times due to a variety of reasons," including Ramos's efforts to secure counsel, changing of IJs over the years, one IJ's request for supplemental briefing, DHS's amendment of its charges, and a venue change after Ramos was transferred to BFDF.  *Id.*at 26-27.  Ramos appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which denied the appeal on May 14, 2020.  *Id.* at 40-43.  The

---

[3] A New York City Pre-Sentence Investigation Face Sheet indicates that Ramos also was arrested on August 20, 2012, for uttering false statements in using a passport and for failing to appear.  *Id.* at 13.  The Face Sheet indicates that the "[d]ispositions are unknown in th[o]se cases."  *Id.*  A separate DHS document, titled a "Record of Deportable/Inadmissible Alien," indicates that Ramos was arrested on September 22, 2011, for those same offenses and convicted on August 20, 2012.  *Id.* at 21-22. Because the respondents have not produced any conclusive evidence of these convictions, but instead rely only on documents that obliquely reference them, the Court will not consider them in its disposition of this matter.  In any event, neither alleged conviction appears to have been material to Ramos's immigration proceedings.

respondents represented that Ramos had neither petitioned the United States Court of Appeals for the Second Circuit to review that denial, nor moved that court to stay his removal.  *See* Docket Item 6-1 at 3.  But in his reply, Ramos asserted that he indeed had taken these steps.  Docket Item 11 at 3.  A review of the Second Circuit docket confirms that Ramos, acting *pro se*, both petitioned for review and moved to stay his removal.  *See Ramos v. Barr*, No. 20-1696, Docket Items 1 and 3 (2d Cir. May 29, 2020).  Those motions remain pending.  *See id.*

## DISCUSSION

### I.  HABEAS PETITION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the laws or treaties of the United States.'"  *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).  The government maintains that Ramos is validly detained under 8 U.S.C. § 1231(a) as a noncitizen subject to a final order of removal.  Docket Item 6 at 1.

Ramos disagrees on three grounds.  First, he contends that his detention for over six months is "unlawful and contravenes 8 U.S.C. § 1231(a)(6) as interpreted by the Supreme Court in *Zadvydas* [*v. Davis*, 533 U.S. 678, 701 (2001)]."  Docket Item 1 at 21-22.  The Court construes Ramos's first claim as arguing that his continued detention violates 28 U.S.C. § 1231(a)(6) because there is "good reason to believe that there is no significant likelihood of [his] removal in the reasonably foreseeable future."[4]  *See*

---

[4] Because Ramos is proceeding *pro se*, this Court holds his submissions "to less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

*Zadvydas*, 533 U.S. at 701.  Second, Ramos argues that his detention violates his right to substantive due process under the Fifth Amendment of the United States Constitution.  *Id.* at 22.  And third, he argues that his "prolonged detention has not been accompanied by the kind of procedural protections that such a significant deprivation of liberty requires" and therefore violates his right to procedural due process under the Fifth Amendment of the United States Constitution.  *Id.* at 23-31.

## II. STATUTORY CHALLENGE

This Court begins by considering the statutory basis for Ramos's detention in order to evaluate his first challenge, alleging that his continued detention violates 8 U.S.C. § 1231 as interpreted by the Supreme Court in *Zadvydas*, 533 U.S. at 701.  The government and Ramos seem to agree that Ramos's detention is governed by 8 U.S.C. § 1231(a).  *See* Docket Item 6 at 1; Docket Item 1 at 21-22.  But this Court disagrees and finds that Ramos's detention is governed by 8 U.S.C. § 1226(c).

"Broadly speaking, section 1226 governs the detention of immigrants who are not immediately deportable." *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018). Section 1231, on the other hand, "addresses the 'removal period' for immigrants facing deportation."  *Id.* at 53.  "[T]he 'removal period' [is] the term used in the statute to describe the 90-day period following an order of removal during which 'the Attorney General shall remove the [noncitizen].'"  *Id.* at 54 (quoting 8 U.S.C. § 1231(a)(1)(A)).

The statute explicitly defines the beginning of the removal period as occurring "on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's final order.

(iii) If the [noncitizen] is detained or confined (except under an immigration process), the date the [noncitizen] is released from detention or confinement."

*Id.* at 54-55 (quoting 8 U.S.C. § 1231(a)(1)(B)).

Ramos has asked the Second Circuit to review the BIA's decision and to stay his removal. *See Ramos* , No. 20-1696, Docket Items 1 and 3. Under DHS's forbearance agreement with the Second Circuit, "DHS will not remove a [noncitizen] who has requested a stay of removal with a petition for review of an immigration order of removal unless a government motion opposing the stay is granted by the court or the [noncitizen's] stay motion is otherwise denied." *Sankara v. Whitaker*, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019). This Court accordingly has held that until a Second Circuit panel rules on an immigrant's request for a stay of his removal, the "forbearance agreement amounts to a court ordered stay of the removal of the [noncitizen]." *See Hemans v. Searls*, 2019 WL 955353, at *3 (W.D.N.Y. Feb. 27, 2019); *Sankara*, 2019 WL 266462, at *4. In other words, this Court construes the forbearance agreement as effectively rendering Ramos's removal stayed under 8 U.S.C. § 1231(a)(1)(B)(ii). Therefore, Ramos is detained under section 1226.

Because Ramos is not detained under section 1231(a), this Court rejects his argument that his detention violates that provision as interpreted by the Supreme Court in *Zadvydas*.

### III. DUE PROCESS

Ramos also alleges that his continued detention violates the Due Process Clause. *See* Docket Item 1 at 22-31. The Fifth Amendment's Due Process Clause forbids the federal government from depriving any "person . . . of . . . liberty . . . without

6

due process of law." U.S. Const. amend. V. The Supreme Court "has held that the Due Process Clause protects individuals against two types of government action." *United States v. Salerno*, 481 U.S. 739, 746 (1987). "So-called 'substantive due process' prevents the government from engaging in conduct that shocks the conscience, . . . or interferes with rights implicit in the concept of ordered liberty." *Id.* (citations omitted). "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Id.* "This requirement has traditionally been referred to as 'procedural' due process." *Id.*

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[G]overnment detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections . . . or, in certain special and narrow nonpunitive circumstances, . . . where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* (emphasis in original) (citations omitted). Other than those unique, special, and narrow circumstances, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." *United States v. Haymond*, 139 S. Ct. 2369, 2373 (2019).

"[Noncitizens], even [noncitizens] whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth . . . Amendment[ ]." *Plyer v. Doe*, 457 U.S. 202, 210 (1982); *see also Shaughnessey v.*

*United States ex rel. Mezei*, 345 U.S. 206, 212 (1954) ("It is true that [noncitizens] who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").  At the same time, Congress has "broad power over naturalization and immigration, [permitting it to] make[ ] rules that would be unacceptable if applied to citizens."  *Demore v. Kim*, 538 U.S. 510, 521 (2003) (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976)).

### A.    Substantive Due Process

Ramos argues that his detention violates his right to substantive due process. Docket Item 1 at 22.  He has been in DHS custody since June 18, 2019—nearly 13 months.  Docket Item 6-1 at 3.  But this Court cannot say that detention that long violates due process.  *See Sanusi v. I.N.S.*, 100 F. App'x 49, 51 (2d Cir. 2004) (summary order) (determining that six-year detention did not violate due process). Indeed, detention under section 1226 may serve the government's compelling interests in both "preser[ving] the government's ability to later carry out its broader responsibilities over immigration matters," *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991), and preventing crime by arrestees who pose a danger to the safety of the community, *see Salerno*, 481 U.S. at 749.  Although there comes a time when the length of a noncitizen's detention pending removal violates due process regardless of the procedural protections afforded, *see Salerno*, 481 U.S. at 747 n.4, that time has not yet come here.

B.      **Procedural Due Process**

Ramos also argues that his detention violates his right to procedural due

process.  Docket Item 1 at 23-31.[5]  The Due Process Clause is not offended by the

mandatory detention of noncitizens for the "*brief period necessary* for their removal

proceedings," *Demore*, 538 U.S. at 513 (emphasis added), but may be violated by

detention beyond that "brief" period, depending on the balance of the individual's and

the government's interests, *see, e.g., id.* at 532 (Kennedy, *J.,* concurring) ("[A] lawful

permanent resident . . . could be entitled to an individualized determination as to his risk

of flight and dangerousness if the continued detention bec[omes] unreasonable or

unjustified."); *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The constitutional

sufficiency of procedures provided in any situation, of course, varies with the

circumstances.").

---

[5] To the extent Ramos contends that his "substantial challenges to deportability," Docket Item 1 at 19, mean that he is not "deportable by reason of having committed" certain designated offenses, 8 U.S.C. § 1226(c), the Court denies that grounds for relief. The Supreme Court did leave open the merits of such an argument.  *See Demore*, 538 U.S. at 522 & n.6 (declining to reach the petitioner's argument that "he might not be subject to detention under [section] 1226(c) after all because his 1997 conviction for petty theft with priors might not qualify as an aggravated felony" due to the fact that the petitioner had "conceded that he [was] deportable for purposes of his habeas corpus challenge to [section] 1226(c) at all previous stages of this proceeding").  But Ramos did not specify the nature of this alleged "substantial challenge," and the only grounds apparent from his petition is cancellation of removal.  *See* Docket Item 1 at 19.  The Court finds no indication that he has challenged whether, for example, any of his prior convictions qualify as aggravated felonies.  And an application for cancellation of removal is not a challenge to removability, but rather a request for discretionary relief. *See, e.g., De La Vega v. Gonzales,* 436 F.3d 141, 143-146 (2d Cir. 2006).  "[T]he Supreme Court's decision in *Demore* all but forecloses the argument that the term 'is deportable,' as used in [section] 1226(c), means anything other than an alien who *prima facie* qualifies for removal, regardless of whatever forms of discretionary relief may be available, as well as the argument that applying the mandatory detention statute to an alien who may qualify for discretionary relief is unconstitutional."  *Young v. Aviles*, 99 F. Supp. 3d 443, 454 (S.D.N.Y. 2015) (citation omitted).

For that reason, this Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry," *Hemans*, 2019 WL 955353, at *5. "A[t] the first step, the Court considers whether the [noncitizen's] detention has been unreasonably prolonged." *Id.* "If it has not, then there is no procedural due process violation." *Id.* "But if it has, the Court proceeds to step two and 'identifies the specific dictates of due process' by considering the *Mathews v. Eldridge* factors." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "If the government has not provided the procedural safeguards dictated by the *Mathews* factors to a [noncitizen] subject to unreasonably prolonged detention, then his continued detention violates procedural due process." *Id.*

### 1.    Ramos's Detention

"[W]hen weighing the lawfulness of continued detention of a [noncitizen] under the Due Process Clause," several factors determine whether detention is unreasonably prolonged. *Jamal A. v. Whitaker*, 2019 WL 549722, at *3 (D. Minn. Jan. 22, 2019). This Court, for example, has considered "(1) the total length of detention to date; (2) the conditions of detention; (3) delays in the removal proceedings caused by the parties; and (4) the likelihood that the removal proceedings will result in a final order of removal." *Hemans*, 2019 WL 955353, at *6.

First, and most important, courts consider the length of detention. Ramos has been in DHS custody since June 18, 2019—nearly 13 months. Docket Item 6-1 at 3. "As detention continues past a year, courts become extremely wary of permitting continued custody absent a bond hearing." *Muse v. Sessions*, 2018 WL 4466052, at *4 (D. Minn. Sept. 18, 2018) (and cases cited therein). In fact, courts have found detention

10

even shorter than a year to be unreasonably prolonged as part of a procedural due process analysis.[6]

In *Demore*, the Supreme Court upheld the constitutionality of section 1226(c), relying on the "very limited time of . . . detention at stake" and noting that "in the majority of cases[, section 1226(c) detention] lasts less than the 90 days . . . considered presumptively valid in *Zadvydas*." *Demore*, 538 U.S. at 529 & n.12; *see also id.* ("[I]n 85% of the cases in which [noncitizens] are detained pursuant to [section] 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days.  In the remaining 15% of cases, in which the [noncitizen] appeals the decision of the Immigration Judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter." (citations omitted)).

Ramos's 13-month detention far exceeds the four-month average cited in *Demore*.  The length of Ramos's detention therefore supports his argument that his detention without an individualized bond hearing has been unreasonably prolonged.

Second, courts consider the conditions of detention.  Whether "the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention" factors into the reasonableness of Ramos's detention.  *Sajous v. Decker*, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018).  "The more that the conditions

---

[6] *See, e.g.*, *Vargas v. Beth*, 2019 WL 1320330, at *8 (E.D. Wis. Mar. 22, 2019) ("approximately nine and a half months"); *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) ("over seven months" and "over nine months" by the next removal-related hearing); *Hernandez v. Decker*, 2018 WL 3579108, at *1, *12 (S.D.N.Y. July 25, 2018) (nine months); *Sajous v. Decker*, 2018 WL 2357266, at *1, *12 (S.D.N.Y. May 23, 2018) (over eight months); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 720 (D. Md. 2016) (exceeding ten months); *see also Sopo v. U.S. Attorney General*, 825 F.3d 1199, 1218 (11th Cir. 2016) ("[A] criminal [noncitizen's] detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case.").

under which the [noncitizen] is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Muse*, 2018 WL 4466052, at *5.

The government has submitted the declaration of a BFDF employee regarding the conditions of Ramos's detention. *See* Docket Item 6-3. In that declaration, the government avers that the facility is unlike a prison because "most persons . . are not locked in a cell," they "do not face the same level of restrictions typical for someone held at a prison," and they "ordinarily may move throughout the BFDF without being required to wear handcuffs or legcuffs." *Id.* at 3-4. "Six of the dorm units are open-dorm style," but three others—for detainees with criminal histories or female detainees—have cell doors that close at night. *Id.* at 3. And "persons held at BFDF [are] required to wear . . . restraints . . . when being booked in or booked out" or when they are "facing discipline [and are] brought to the Special Housing Unit ("SHU")." *Id.* at 4.

Because of the cells, restraints, and discipline in the SHU, conditions at BFDF certainly "resemble penal confinement" for at least some persons detained there. *Muse*, 2018 WL 4466052, at *5. And while the record contains no facts about the particular conditions of Ramos's confinement, he may well have been locked in a cell because, as the government repeatedly highlights, he has a criminal history. So the government has not shown that Ramos's detention is "meaningfully different from [detention in] a penal institution." *Sajous*, 2018 WL 2357266, at *11. This factor therefore weighs in Ramos's favor as well.

Third, courts consider whether the detainee has prolonged his own detention. The Second Circuit has found that this factor weighs against finding detention unreasonable when a noncitizen has "substantially prolonged his stay by abusing the

processes provided to him" but not when "an immigrant . . . [has] simply made use of the statutorily permitted appeals process." *Hechavarria*, 891 F.3d at 56 n.6 (first quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).   As the Sixth Circuit has noted, "appeals and petitions for relief are to be expected as a natural part of the process.   A [noncitizen] who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him." *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003) (cited in *Hechavarria*, 891 F.3d at 56 n.6).   Indeed,

> although a [noncitizen] may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take.   The mere fact that a [noncitizen] has sought relief from deportation does not authorize the [government] to drag its heels indefinitely in making a decision.   The entire process, not merely the original deportation hearing, is subject to the constitutional requirement of reasonableness.

*Id.*

Here, DHS charged Ramos with removability on August 21, 2012, Docket Item 6-2 at 5-7, and Ramos promptly applied for relief from removal, *see id.* at 26-27.   The proceedings were "continued fifteen times due to a variety of reasons," including Ramos's efforts to secure counsel, changing of IJs over the years, one IJ's request for supplemental briefing, DHS's amendment of its charges, and a venue change after Ramos was transferred to BFDF.   *Id.* at 26-27.   Focusing more narrowly on the time since Ramos was taken into custody in June 2019, the proceedings have been continued to change venue, to afford Ramos time to secure new counsel, and so that Ramos's new counsel could brief the IJ on certain issues.   *Id.* at 27.   The IJ denied Ramos's applications shortly after she heard argument in November 2019, but the BIA did not affirm that decision until May 2020.   *Id.* at 27, 34, 40-43.   Ramos then promptly

petitioned the Second Circuit for review.  *See Ramos v. Barr*, No. 20-1696, Docket Items 1 and 3 (2d Cir. May 29, 2020).

Although Ramos has caused some of the delay in his removal, he has not "abus[ed] the processes provided to him."  *See Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken*, 556 U.S. at 436).  That is particularly true in the time period since he was detained.  He has requested continuances to secure counsel—at times requests prompted by the respondent's decisions to relocate him; otherwise, he has done nothing more than challenge his removal and appeal the IJ's decision to the BIA and then to the Second Circuit.  The government decision makers, in contrast, collectively are responsible for at least eight months of delay since taking Ramos into custody.  Therefore, the third factor weighs in Ramos's favor.

Finally, courts consider the likelihood that the removal proceedings will result in a final order of removal.  This Court declines to weigh the merits of Ramos's claims pending before the Second Circuit.

After balancing all these factors, this Court finds that Ramos's detention has been unreasonably prolonged.  Therefore, this Court turns to the second step of the two-part inquiry to determine what remedy his unreasonably-prolonged detention demands.

### 2.     The Process Due to Ramos

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors," *id.* at 335,

namely: "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017). Here, that analysis leads to the conclusion that Ramos's continued detention without an individualized hearing, at which the government must justify his continued detention by clear and convincing evidence, fails to "comport with the 'fundamental fairness' demanded by the Due Process Clause." *See Schall v. Martin*, 467 U.S. 253, 263 (1984).

Ramos's interest in his freedom pending the conclusion of his removal proceedings deserves great "weight and gravity." *Addington v. Texas*, 441 U.S. 418, 427 (1979). Ramos has an obvious interest in his "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint." *Zadvydas*, 533 U.S. at 690. Moreover, while "[t]he private interest here is not liberty in the abstract, but liberty *in the United States*," *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (emphasis in original), Ramos has not conceded his deportability, and the resolution of that issue remains pending before the Second Circuit. In fact, his interest in liberty *in the United States* must indeed be strong for him to subject himself to unreasonably-prolonged detention while contesting his deportability. *See Fremont v. Barr*, 2019 WL 1471006, at *6 n.7 (W.D.N.Y. Apr. 3, 2019).

And there appears to be good reason for that strong interest. Ramos claims that his sons are United States citizens. *See* Docket Item 1 at 1. These family members live not in the Dominican Republic, where the government wishes to send him, but in the United States, where Ramos himself has lived for about twenty-five years. *See id.* Thus, if Ramos chose not to challenge his removal, he would "lose the right to rejoin

[his] immediate family, a right that ranks high among the interests of the individual."
*Landon*, 459 U.S. at 34.

This Court recognizes that the government's interest in detaining Ramos also may be strong. The government contends that Ramos's risk of flight and disregard for the law justify his continued detention. Docket Item 7 at 19-20. In fact, Ramos is detained under 8 U.S.C. § 1226(c), which applies to aliens who fall "into one of several enumerated categories involving criminal offenses and terrorist activities." *Jennings*, 138 S. Ct. at 837. "[Noncitizens] detained under [that] authority are not entitled to be released under any circumstances other than those expressly recognized by the statute."[7] *Id.* at 846. Thus, in mandating the detention of criminal aliens, the statute reflects a congressional purpose of reducing the risk of flight and danger to the community. *See Demore*, 538 U.S. at 518-19 (explaining that Congress found that "deportable criminal aliens who remained in the United States often committed more crimes before being removed" and that "20% of deportable criminal aliens failed to appear for their removal hearings"[8]). "The government's interest in preventing crime by arrestees is both legitimate and compelling." *Salerno*, 481 U.S. at 749. And general concerns about the risk of flight highlight the government's compelling interest in

---

[7] The exception from mandatory detention is a "limited authorization for release for witness-protection purposes," *Jennings*, 138 S. Ct. at 846, not applicable here.

[8] The Court noted that this number included aliens who were released from custody *without* an individualized bond hearing. *Demore*, 538 U.S. at 519 n.4 ("Although the Attorney General had the authority to release these aliens on bond, it is not clear that *all* of the aliens released were in fact given individualized bond hearings." (emphasis in original)).

preserving its "ability to later carry out its broader responsibilities over immigration matters." *Doherty*, 943 F.2d at 211.

This Court concludes that in light of the procedures used thus far, there is a significant risk of an erroneous deprivation to Ramos's liberty interests. Section 1226(c) prohibits the government from offering a detainee the opportunity to challenge whether he is, in fact, a danger or a flight risk. *Jennings*, 138 S. Ct. at 846. Now that Ramos's detention has become unreasonably prolonged, due process requires *some* opportunity to be heard "at a meaningful time and in a meaningful manner," *Armstrong*, 380 U.S. at 552, to challenge the statute's assumptions as applied to him.

An opportunity to be heard in a meaningful manner necessarily requires a hearing that "satisfies the constitutional minimum of fundamental fairness." *Santosky v. Kramer*, 455 U.S. 745, 756 n.8 (1982) (citation omitted). When the government seeks the civil detention of a person to effect a compelling regulatory purpose, it must show by clear and convincing evidence that such detention is necessary to serve that compelling interest. *See Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992); *Addington*, 441 U.S. at 432-33; *see also Santosky*, 455 U.S. at 756 (explaining that the "clear and convincing evidence" standard applies "when the individual interests at stake in a . . . proceeding are both 'particularly important' and 'more substantial than mere loss of money'" (quoting *Addington*, 441 U.S. at 424)). That standard applies equally here.

To sustain the prolonged detention of a noncitizen subject to removal proceedings based on its general interests in immigration detention, the "[g]overnment [is] required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the

17

safety of the community or any person," *Foucha*, 504 U.S. at 81 (quoting *Salerno*, 481 U.S. at 751), or ensure that the noncitizen will appear for any future proceeding.[9]  This requires consideration of less restrictive alternatives to detention.  *See id.*; *cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

Ramos's section 1226(c) detention has been unreasonably prolonged.  Because section 1226(c) does not require an individualized hearing in which the government must demonstrate by clear and convincing evidence that no conditions of release can reasonably serve the government's compelling regulatory interests in detaining him, it is unconstitutional as applied to him.  As such, his continued detention violates the Due Process Clause.

Ramos must be released unless, no later than **14 calendar days from the date of this decision and order**, the government demonstrates by clear and convincing evidence before a neutral decision maker that Ramos's continued detention is necessary to serve a compelling regulatory purpose—such as preventing flight or protecting others or the community.  The decision maker also must consider—and must address in any decision—whether there is clear and convincing evidence that there are no less-restrictive alternatives to physical detention, including release on bond in an

---

[9] As this Court explained in *Hemans*, 2019 WL 955353, at *8 n.7, a pretrial detainee's right to a speedy trial distinguishes the interests supporting the evidentiary standard traditionally applicable to flight-risk determinations for pretrial detention purposes from what is required after an unreasonably-prolonged immigration detention.

amount the petitioner can reasonably afford, with or without conditions, that also would reasonably address those same regulatory purposes.

## IV.   LIMIT ON TRANSFERRING RAMOS

Ramos also has asked this Court to order the respondents and their "agents not to remove [him] from the jurisdiction of this Court during the duration of the consideration of this petition." Docket Item 11 at 7.

Now that this Court has conditionally granted Ramos's writ, his jurisdictional concerns are not unreasonable. After all, "conditional writs 'would be meaningless' if a habeas court could not determine compliance with them and order sanctions accordingly." *Mason v. Mitchell*, 729 F.3d 545, 549 (6th Cir. 2013) (quoting *Satterlee v. Wolfenbarger*, 453 F.3d 362, 368 n.5 (6th Cir. 2006)). But "[it] is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change." *See Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 888 (10th Cir. 1985). In other words, regardless of where Ramos is housed, this Court retains jurisdiction over his habeas petition. So there is no need to interfere with DHS's authority to "arrange for appropriate places of detention" under 8 U.S.C. § 1231(g)(1).

## ORDER

In light of the above, IT IS HEREBY

ORDERED that **within 14 calendar days of the date of this decision and order**, the government must release Ramos from detention unless a neutral decision-

maker conducts an individualized hearing to determine whether his continued detention is justified; and it is further

ORDERED that at any such hearing, the government has the burden of demonstrating by clear and convincing evidence that Ramos's continued detention is necessary to serve a compelling regulatory purpose, such as minimizing risk of flight or danger to the community.  Whether detention is necessary to serve a compelling regulatory purpose requires consideration of whether a less-restrictive alternative to detention would also address the government's interests.  In other words, the decision maker must find that no condition or combination of conditions of release can reasonably ensure Ramos's appearance and the safety of the community—that is, even with conditions, Ramos presents an identified and articulable risk of flight or a threat to an individual or the community; and it is further

ORDERED that **within 30 days of the date of this decision and order** the government shall file an affidavit certifying compliance with this order.  That affidavit should include a written copy of the IJ's decision.

       SO ORDERED.

Dated:       July 20, 2020
              Buffalo, New York

                                */s/ Hon. Lawrence J. Vilardo*
                                LAWRENCE J. VILARDO
                                UNITED STATES DISTRICT JUDGE